May it please the Court, my name is Mina Aciura on behalf of the petitioner Mr. Alazar Arsdi. Mr. Arsdi respectfully asks that this Court reverse the Immigration Judges and the Board of Immigration Appeals order removing Mr. Arsdi from the United States to Ethiopia and denying him relief in the forms of withholding of removal and Convention Against Torture. I will make two points. That the Immigration Judge erred in denying Mr. Arsdi Convention Against Torture relief and second, that the Immigration Judge applied an incorrect legal standard when deciding the issue of a particularly serious crime. On my first point regarding the Convention Against Torture, the Immigration Judge made two legal errors. First, the Immigration Judge failed to make an individualized assessment of Mr. Arsdi's case and second, the Immigration Judge failed to consider relevant country conditions as shown in the country report when deciding the Convention Against Torture claim. On my first point regarding the failure to make an individualized assessment, this Court in Gali v. INS held that the Immigration Judge must make an individualized assessment of Mr. Arsdi's case. Cases like Nuru and Muradin are relevant in showing how this Court approaches this issue. Basically, the Court makes the connection between the relevant facts in the Petitioner's case and the country report conditions. Here, an individualized assessment translates into tying the facts of Mr. Arsdi's case with the relevant country conditions. Well, Counsel, what troubles me is that this Petitioner never was involved in the Orono Liberation Front. He had no, certainly perhaps some family members sometime before, but he was never involved and there was no showing that he was liable to be tortured. He was never identified. He was never targeted. Yes, Your Honor. However, an individualized assessment in Mr. Arsdi's case consists in seeing the likelihood that the Ethiopian government would impute the political opinions of Mr. Arsdi's family like they did with other members of Mr. Arsdi's family and country conditions that state that family members of those sought for questioning are being detained and detainees are being tortured. And this is on pages 236 of the record and 234. Well, what was the showing made on his behalf that he, not his parents, but he would be tortured? Ms. Sayo, Ms. Arsdi's mother, testified that family members like her 16-year-old brother and her two sisters disappeared at the hands of the government. And there's no indication on the record that these family members had any political affiliation. It was only because they were affiliated with a politically active family that they were targeted by the government. The immigration judge also focused on the fact that too much time had passed for Mr. Arsdi to be targeted by the Ethiopian government. However, the country report states that the conditions have not changed in Ethiopia. Moreover, Ms. Sayo testified that she was afraid, she would be afraid of going back now and she believed that even now the Ethiopian government would go after her because she went against the instructions she had received when she was released from prison and of not going after her husband. She fled the country and she hid the children and fled the country with the children. Therefore, there is a clear indication that she would be sought for questioning. And the country report states that family members who are family members of those sought for questioning are being detained by the Ethiopian government. On my second point, the immigration judge failed to consider critical country conditions. This court in Abassi held that the board must consider all relevant information in the country report. Also, in Kamalthas, the court held that an adjudicator must give weight to relevant country conditions. There are specific examples in the immigration judge's decisions that prove that the immigration judge did not apply the correct legal standard. For example, the immigration judge focused, erroneously focused on the fact that the Oromo is to represent 40% of the population in Ethiopia. You should slow down. I'm sorry, Your Honor. Yes. It's hard to follow. Yes, Your Honor. You're talking about the immigration judge's written decision or the oral ruling? The oral decision. Okay. And where are you referring to? In the oral decision. I'm sorry, I don't have the page of the record. But in the oral decision Go get it and take a look. Get the record and tell me it's not helpful if you don't point to it. You're telling us about how the immigration judge didn't take country conditions into account. You're saying something about the ruling proving that. So I'd like to know where it is you're referring to that gives a point that proves that. Yes. The oral decision of the immigration judge starts at page 17 of the record. Yes. I know where it starts. I'm asking you where in the ruling you're referring to. You're making a point about the ruling. You're making a point about the ruling. So I'd like to look at the actual language that you're relying on. On page 23 of the record, towards the end of the page. Could you please repeat the page to which you referred? Page 23 of the record, Your Honor. 23? Yes. Okay. What line? The fourth line starting from the last line. Starting from where? From the end. The fourth line from the end up. It has a number. If you look all the way to the left, there are little numbers. I apologize, Your Honor. Mine doesn't. I don't mind. It's the last paragraph, line 6. I'm sorry. It's page 23 of the record. Yes. Page 23 of the record. Okay. There, the immigration judge focuses on the fact that the Oromo ethnic group makes up 40% of the population in Ethiopia. Okay. And while this is true. Is that not true? Yes, it is true. However, there is other information in the country report that states that two other minority ethnic groups control the political and the cultural life of the country. And moreover, the focus on the ethnicity is not quite exact here, because Mr. Rajdi's argument is that the Oromos that are affiliated with the Oromo Liberation Front are the ones that are targeted by the Ethiopian government, not the entire Oromo ethnicity. And this is extremely relevant here because Mr. Rajdi's family was targeted for exactly being affiliated with the Oromo Liberation Front. But I thought your point you were making is that the IJ didn't take into account country conditions. Country conditions are things that don't apply to specific individuals. So you've just shifted gears on me and say, you know, the IJ didn't consider information that's relevant to him and his family. That's not country conditions. Country conditions are conditions that prevail in the country that apply generally. Yes. I don't understand how this shows your point. Yes, Your Honor. Our point is that the immigration judge selectively focused on certain country conditions, but not on the ones that were relevant in this case. Like he selectively picked a couple of segments in the country report, but not the ones that were relevant in this case. Okay. Like what country conditions did the IJ not consider? Like the fact that the Ethiopian government focuses on those who are affiliated with the Oromo Liberation Front and also on the family members of those people and detains them, and detainees often report torture. Also, he failed to consider that. I mean, when you say he failed to consider it, he does not specifically mention in his orders, in your ruling, what you're saying. Your Honor, could you please repeat the question? It's not mentioned in the ruling, in his ruling. I thought you were going to show me that there was something in the order that proved he didn't actually take it into account. Well, his focus is contradicted. His focus and his decision is contradicted by the statements in the country report. Like the focus on the Oromos being the majority in the country as indicative of the unlikelihood that Mr. Rajdi would be targeted if he were to return. Moreover, he failed, in Mr. Rajdi's case, he failed to consider the fact that Mr. Rajdi bears the name of his father and of his grandfather, and the name also alleges his Oromo ethnicity. And his father was imprisoned, tortured, and killed by the Ethiopian government. Okay, you're both out of time. Do you want to say what little time you have left? If you would allow me to conclude, for the reasons stated, Mr. Rajdi's You're out of time. I'm sorry. Thank you. Okay, we'll hear from the government. May it please the Court, Aaron Petty on behalf of the Attorney General. As a 17-year-old, Alzar Rajdi took a pump-action shotgun from the trunk of a friend's car, pointed it at one, possibly two people, and then relieved his victim of a wallet and cell phone. He was convicted of armed robbery, sentenced to four years, and an immigration judge concluded that this crime was particularly serious, such that he was barred from withholding of removal. The Court lacks jurisdiction to review that determination, which was in any event not legally erroneous. And further, record evidence would not compel a reasonable fact-finder to conclude that he was eligible for cat deferral. Matter of frontescue requires that immigration judge Why don't you speak to the jurisdictional argument? Frontescue. The jurisdictional argument first. Well, that's how it usually works, isn't it? Generally. I mean, you set them in those order. If we don't have jurisdiction, there's no point in talking about anything else, is there? That's true, Your Honor. There are two jurisdictional problems with the withholding of removal issue. First, there's no exhaustion. And second, the challenges that are made are not legal challenges. There's nothing in Arzdi's appeal to the board that mentioned a particularly serious crime finding. He said he wanted the IJ's decision reversed because of the likelihood of persecution and because the IJ failed. The problem is the board cites Bourbano. And we felt that when the board cites matter of Bourbano, that means we rebuke the entire ruling. It basically adopts the entire IJ's ruling. So whatever arguments are made to the IJ is deemed to have been made to the board. Isn't that our law? Abibi, for example? Well, and the Petitioner cited Matuku. The problem with that applying on these facts is that it would run headlong into Ventura. Matuku said that where an issue has been presented to an immigration judge and the BIA affirms citing Bourbano, then the issue is deemed exhausted. That's fine, but that's not what happened here. Here he's challenging the immigration judge's analysis. He couldn't have presented it to the immigration judge before the IJ made a decision because there was no problem yet. He didn't present it to the IJ after the IJ's decision because there was no motion for reconsideration filed. And he didn't present it in a brief to the board. So this issue regarding the matter of Francescu has not been before an agency adjudicator at all. It's Frantescu, not Francescu. Frantescu? Yes. My apologies. So because no agency adjudicator has ruled on this argument, the Court can't do so without running afoul of both Ventura and the exhaustion requirement of 1252d-1. In addition to that, if the challenge... That's a subtle distinction. So we deem the issue exhausted, but not the challenge to the immigration judge's sufficiency, I guess, of the analysis. I think that's basically correct. When there's a substantive... It's a fine line. When there's a substantive challenge, for example, in Mutuku, it was an issue of country conditions. He could go before the IJ and say, here are the country conditions that are problematic. I want you to rule in my favor. You can't do that when the challenge is to the manner in which the immigration judge decides. You can only do it after the fact. And that wasn't done here. So no agency adjudicator has ever passed on his contention that he's making for the U.S. Court. In addition to that, the challenges that he's making to the particularly serious crime determination aren't legal. He's challenging the weight the IJ attributed to the four-year sentence, the weight accorded to the fact that it was classified as a non-dangerous, non-repetitive offense, the weight accorded to the trauma that he purportedly endured in Ethiopia, and the weight accorded to findings of the pre-sentence investigation report regarding his dangerousness to the community. I would have thought of the question of whether it's a dangerous offense would be something the matter of law, wouldn't it? If it's classified as such on a legal basis, then it might be. But we don't have in the record here the reason why it was classified as such. It looks as though it was part of plenegotiations. Let's talk a little bit about the standard. I mean, you can commit a non-dangerous crime in a dangerous way. I mean, let's say, I mean, if you speed in your automobile, right, normally, you know, probably most of us have done that at one point or another. So going 55 miles an hour in a 45 zone, I think most people would say is not a dangerous offense. But let's say you do it 55 miles an hour in a construction zone or near a school, you know, when there are the yellow lights flashing, then it could become dangerous. We wouldn't say the crime itself is dangerous. Then there are other crimes that are inherently dangerous. Armed robbery, for example. Well, I didn't want to use something that was actually the case here, but murder or attempted murder or something like that would be something inherently dangerous. And my understanding of what we are looking for here is not whether the crime was committed in a dangerous way, so the application of, to this particular case, but whether it's a dangerous crime. Well, actually. And I would have thought that that cleaves, you know, we can do that without actually looking at particularly at the facts of the case. Is it my, am I? Well, I think we're getting too far into the State court determination, and we don't want to be relitigating what happened in State court. The fact that it was classified as a non-dangerous, non-repetitive offense is a relevant consideration that the IJ can and should consider in making the particularly serious crime determination, and he did so. But whether it actually was a non-dangerous, non-repetitive offense is something that I think is outside the scope of the immigration judge's discretion. But what I'm trying to get at, in your view, is we look at the actual facts of the way the crime was committed in this case, rather than looking at the offense generically. If, for example, somebody commits an armed robbery but uses a toy gun, let's say, I mean, no gun at all, perhaps just a finger in the pocket, pretending to be a gun, might one say, well, maybe that is a robbery that was committed in a non-dangerous way, or would we say armed robbery is always dangerous and the facts of the particular case don't matter because the question is the nature of the crime? I see what Your Honor is saying. I think one would be a question of law, the other one would be a question of fact. If we should have looked at crimes generically and said, you know, certain crimes are dangerous crimes, it doesn't matter how you committed them in a particular case. But we have a prior determination that we need to make, which is, is this a legal question with regard to did the immigration judge look to the correct factors, without getting into the specifics of the case at all, categorical, specific, or otherwise? Was this an appropriate issue for the immigration judge to be considering? And I think it was. I mean, we have... And then your answer is, to Judge Kaczynski's question, you do look at the facts of how the crime was committed, because in your opening statement you talked about a pump shotgun. That's correct. I mean, you can look to the facts, but the challenge itself has to be to whether this was an appropriate category of issue for the immigration judge to base the particularly serious crime finding on. Just very quickly with regard to the cat deferral claim, I said in the brief the Court lacked jurisdiction. I'd like to retract that. The Court does have jurisdiction over the merits of the cat deferral claim. What's your response to counsel's argument on the cat claim? He's identified no one similarly situated to him who's been tortured, and there's no evidence on this record that children of Ethiopian separatists are tortured by the Ethiopian government with any regularity. And in the absence of record evidence, the record can't compel a contrary conclusion. There's no evidence that the Ethiopian government would even identify Arzdi as related to his relatives who were persecuted. Counsel seemed to argue, if I understood her argument, was that the immigration judge was at least required to consider the possibility that they would torture somebody who's a child of somebody who had been politically involved. And he or she seems to say that he didn't do that. What is your answer to that argument? Well, first of all, proceedings before the immigration courts are accorded a presumption of regularity. So to say that the immigration judge failed to consider something, we generally need more than an omission. I see my time is up. Go ahead. Do you have anything else to say in response to that point? I would say the best that he can show is that torture occurs in Ethiopia and that sometimes it occurs with political dissidents as the victims. But he can't make the connection between those people and himself. But the absence of discussion, you rely on the presumption of regularity. And the record as a whole simply doesn't show that people in his position are regularly tortured. Okay, thank you. I thank the Court. We are out of time. We may take a minute for rebuttal if you wish to take it. Thank you, Your Honor. On rebuttal, I would argue that the government's argument that Mr. Rajdi did not exhaust and would have exhausted only if he had filed a motion for reconsideration must fail because a motion for reconsideration is a discretionary remedy and is not a remedy as of right within the meaning of 8 U.S.C. 1252 D.1. And on the argument regarding children who are not detained by the Ethiopian government, I would point to the fact that Ms. Iyom testified that her brother, her 16-year-old brother who was a minor at the time, was detained by the Ethiopian government and disappeared while in police custody. Therefore, the Ethiopian government definitely detains children as well. Okay, thank you. Thank you, Your Honors. Okay, that's how you will stand for a minute.
judges: Kozinski, O'scannlain, Bea